UNITED STATES of America, Plaintiff–Appellee,

v.

Julia McMILLON, a/k/a Julia Walker, a/k/a Julia Bivens, Defendant–Appellant.

No. 93–5039.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 30, 1993.

Decided Jan. 21, 1994.

---

**ARGUED:** Thomas Abbenante, Washington, DC, for appellant. Quincy Leon Ollison, Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Mary E. Davis, Washington, DC, for appellant. Kenneth E. Melson, U.S. Atty., Alexandria, VA, for appellee.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and CHAPMAN, Senior Circuit Judge.

## OPINION

ERVIN, Chief Judge:

Julia McMillon was indicted on one count of conspiring to distribute fifty grams or more of cocaine base from June 1990 through March 1991 in violation of 21 U.S.C. § 846 and seven counts of distributing cocaine base of various amounts on a number of dates between August and October 1990 in violation of 21 U.S.C. § 841(a)(1). After two of the distribution counts were dismissed, McMillon was convicted on all six remaining counts on September 15, 1992, and was sentenced by the district court to 360 months imprisonment. She appeals several rulings by the district court at trial. We affirm.

I

Julia McMillon was in charge of a crack distribution organization in the Washington, D.C. area. Her indictment and arrest resulted from a domino-effect series of arrests and cooperation agreements involving individuals below her in the organization, each of whom provided evidence regarding people above them.

Agent Steve Shillingford of the Fairfax County Police initially arrested Benjamin Hammonds after purchasing crack cocaine from him on several occasions. Through the subsequent arrests and interviews, it was discovered that Hammonds in early 1990 told Rodney Williams that he was seeking a source of supply of cocaine, and that in March 1990, Williams introduced Hammonds to his cousin, Antoinette (Toni) Williams for that purpose. Toni Williams told Hammonds that her source (McMillon) was out of town at the moment, but attempted to locate drugs for him anyway, and sold him two quantities of cocaine over the next few months that were supplied to her by McMillon's sons-in-law.

McMillon had left the Washington, D.C. area in early 1989 and moved to Miami following a police raid on her house in Maryland. In the late spring of 1990, she returned to the D.C. area, accompanied by Jacques Beckwith. McMillon indicated to Toni Williams, whom she had known since 1980 and out of whose house she began to sell drugs in 1987, that she had returned to do some more business, and Williams agreed to act as a broker and finder for McMillon.

In the months covered by the conspiracy charge, the basic procedure was for Beckwith to travel to Miami to obtain cocaine and return with it to Maryland; once a supply arrived, Toni Williams would inform Hammonds or others, who would then come to Ms. Williams' house for the transaction. McMillon herself never handled the cocaine in plain sight; this job usually was handled by Beckwith or Ms. Williams in the living room, while McMillon remained in the upstairs bedroom where she would measure out the quantity sold and count the money. Hammonds would purchase an eighth or quarter kilo of cocaine, which he then would cook into crack and separate into small, street-level quantities for further sale. After Hammonds' arrest, he provided information against Rodney and Toni Williams and Beckwith, and these three named McMillon, eventually testifying against her at trial.

II

McMillon first requests a new trial on the grounds that the United States violated the Equal Protection component of the Fifth

Amendment by exercising a peremptory strike against an African–American woman because of her race.

## A

There were two African–Americans in the venire, one male and one female. The prosecutor exercised one of his peremptory strikes to remove the female. Defense counsel immediately challenged the strike. The exchange was brief:

THE COURT: This lady, what is her name, what number is she?

MR. ABBENANTE: Well, she was seated in No. 1, but there's No. 28 next to her.

THE COURT: It's Gloria Nelson, black woman. Mr. Ashby?

MR. ASHBY: Your Honor, the reason we struck her is because she's a computer analyst who is about the same age as this defendant, has one child. She is separated. We feel like she would sympathize with this defense.

THE COURT: Does the defendant have a similar background?

MR. ASHBY: They appear to be the same age, they both have children, we thought for that reason we should strike her.

MR. ABBENANTE: Your Honor, my client takes the position, this is one of the only two jurors on the panel that could be a jury of her peers. The fact that she is a computer analyst, I don't see how that has any relevance as far as my client is concerned or this case is concerned. The fact that she has one child, my client has more than one child. There's only one other [black] potential juror on this panel who is male, and we would just note our objection.

MR. ASHBY: Also point out, Your Honor, there is one other black on the jury panel.

THE COURT: All right. But you struck her mainly because she's the same age, children?

MR. ASHBY: Yes.

THE COURT: I feel that's sufficient reason to strike her. I will note your objection, Mr. Abbenante.

MR. ABBENANTE: Thank you.

There was no further treatment of this issue. Although McMillon now indicates that at least one seated member of the jury also was a mother in the same age range as the struck venireperson, this was not presented to the district court and was not made a part of the record for appeal.

## B

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court reaffirmed the holding of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that a prosecutor's use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment. Because the standard of proof set out in *Swain* was deemed so "crippling" that it largely immunized peremptory challenges from constitutional scrutiny, *Batson*, 476 U.S. at 92–93, 106 S.Ct. at 1720–21, the Court revisited the proof issue in light of the extensive jurisprudence on proof of intentional discrimination that had developed in the intervening years.

The Court acknowledged that a "prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried," 476 U.S. at 89, 106 S.Ct. at 1719 (citation and internal quotation omitted), but added that the "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* The Court thus faced the same difficulty presented in other areas where an action's legitimacy depends upon its motivation, e.g., how to discern whether an action by an otherwise unfettered actor is animated by an illegitimate discriminatory bias or by a legitimate motivation. The Court outlined a proof structure that largely follows the framework for Title VII disparate treatment cases established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under this structure, as elaborated in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the plaintiff first must make out a prima facie case of discrimi-

nation. This is a three-step process. First, the defendant must show that the prosecutor used one of his peremptory strikes to remove a member of a cognizable racial group from the venire.[1] Second, the defendant can rely on the fact that peremptory challenges permit those who are of a mind to discriminate to do so. Finally, "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723.

If the plaintiff makes a prima facie showing of intentional discrimination, the burden of production then shifts to the prosecutor to come forward with a neutral explanation for the use of his peremptory strike. 476 U.S. at 97, 106 S.Ct. at 1723. "[W]e emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* However, it must be a "clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20 (internal quotations and citation omitted). Finally, the trial court must determine whether the defendant has met his burden of proof and established purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1723; *Hernandez v. New York,* 500 U.S. 352, ——, 111 S.Ct. 1859, 1865, 114 L.Ed.2d 395, 405 (1991) (plurality opinion).

This circuit has applied *Batson* on several occasions and elaborated its proof structure in a number of ways. In *United States v. Lane,* 866 F.2d 103 (4th Cir.1989), we stated that we will not examine whether the defendant has met his burden in establishing a prima facie case where the prosecutor articulates reasons for his strikes. Id. at 105; *United States v. Joe,* 928 F.2d 99, 103 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 71, 116 L.Ed.2d 45 (1991).[2] And in *Joe,* we indicated that where the government has advanced facially neutral reasons for the strike, the "court should provide the defendant with the opportunity to establish pretext and then issue a specific ruling ... supported by its findings of fact and its rationale for the ruling." 928 F.2d at 103. *Joe* thus extended the similarity to *McDonnell Douglas* by fleshing out the third step of the analytic structure and allowing the defendant the opportunity to show that the prosecutor's reasons were merely pretextual and that a discriminatory motive was in fact the reason behind the challenged strike.[3]

■ In the case at hand, although this matter was handled through a quick bench conference that did not closely track the structure set out in *Batson* and *Joe,* nonetheless we are convinced that the prosecutor did not use his peremptory strike impermissibly. Once defense counsel objected to the strike, the judge noted that the woman was black

---

1. Under the formulation announced in *Batson,* the defendant needed to show that he was a member of the same cognizable racial group as the struck venireperson. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722. In *Powers,* the Court noted that, while one aspect of the harm that flows from a race-based strike involves the defendant on trial, such action also harms the struck venireperson. 499 U.S. at 406–10, 111 S.Ct. at 1368–69, 113 L.Ed.2d at 422–24. Given this independent harm, the Court found that the defendant has third-party standing to assert the equal protection claim of the struck individual, and thus dispensed with the requirement of racial identity between defendant and venireperson in making out an equal protection claim. *Id.* 499 U.S. at 411–17, 111 S.Ct. at 1370–74, 113 L.Ed.2d at 425–29.

2. The Supreme Court subsequently adopted this approach in *Hernandez.* 500 U.S. at ——, 111 S.Ct. at 1865, 114 L.Ed.2d at 405 (plurality opinion).

3. It is clear, in light of the Court's recent treatment of this topic in the Title VII context in *Saint Mary's Honor Center v. Hicks,* —— U.S. ——, ——–——, 113 S.Ct. 2742, 2748–50, 125 L.Ed.2d 407, 418–19 (1993), that this final step is but a part of the larger inquiry by the court into whether the defendant has advanced evidence that meets its burden of proving that the prosecutor's strike was animated by a prohibited motivation. As in *Hicks,* simply showing that the reasons advanced are pretextual does not *automatically* compel a finding of intentional discrimination (although under the proper facts such a showing can be sufficient). Instead, the inquiry always remains the same: the challenging party (here, the defendant) must show, through all relevant circumstances, that the prosecutor intentionally exercised his strike because of racial concerns.

and asked the prosecutor for his reasons for the strike. The prosecutor stated that the struck venireperson was the same age and sex as McMillon and that both were mothers. He stated that he feared that she would sympathize with McMillon based on these similarities. The judge then accepted these reasons and rejected the *Batson* challenge.

Because the trial judge moved directly to the second step, we have no occasion to determine whether McMillon carried her burden of making out a prima facie case inferring discrimination. We agree with the district court that the reasons advanced by the prosecutor, standing alone, are legitimate and nondiscriminatory. One of the most regular uses of peremptory strikes is to eliminate from the final jury venirepersons whom either side believes will be too sympathetic to its opponent. While parties in some cases have employed sophisticated experts to assist in the jury selection process, in most cases counsel on both sides attempt in some crude fashion to reduce the presence of sympathy votes by striking venirepersons having the most obvious common traits linking them to the other side. While *Swain* and *Batson* instruct that race cannot be a trait on which a strike is premised, the approach best expressed by the familiar phrase "There but for the grace of God go I" remains a standard and permissible justification for peremptory strikes. Thus, we are satisfied that the prosecutor articulated a legitimate, nondiscriminatory reason for striking this venireperson based on these similarities between her and McMillon in this case.[4]

The burden thus lay with defense counsel to show *both* that these reasons were merely pretextual *and* that race was the real reason for the strike. In this instance, although he attempted to distinguish the characteristics of his client from those of the struck venireperson, the judge accepted the legitimacy of the prosecutor's reasons and did not find them to be mere pretext. Whatever our approach would be as trial judges, looking at this from the cold record of appeal we cannot say that this was error.

In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

*Hernandez*, 500 U.S. at ——, 111 S.Ct. at 1868, 114 L.Ed.2d at 409 (plurality opinion) (internal quotation and citation omitted). Here the demeanor and credibility of the prosecutor constituted the principal evidence. The trial judge, present on the scene, found that the reasons articulated were both nondiscriminatory and actual. Given the reasonable similarities between defendant and venireperson and the inability of defense counsel to produce evidence demonstrating that race-based discrimination was the motivating force for the strike, we affirm the district court's finding rejecting the *Batson* challenge.[5]

---

**4.** It must be acknowledged that, whenever the defendant and struck venireperson are of the same race, a "sympathy" approach based on similar characteristics between defendant and venireperson will always have the lurking danger that it is animated not by the stated common characteristics but rather by the prohibited identity of race. This identity plays a significant role in determining whether the defendant has met his burden in making his prima facie case. At the second stage of the *Batson* structure, however, the inquiry focuses simply on whether the prosecutor has articulated a reason that, standing alone and absent the inference of racial motivation that the prima facie case introduces, can be considered legitimate and nondiscriminatory. If this burden is met, the court then addresses and evaluates all evidence introduced by each

side (including all evidence introduced in the first and second steps) that tends to show that race was or was not the real reason and determines whether the defendant has met his burden of persuasion.

**5.** McMillon argues that discriminatory intent can be found in the fact that the United States objected to the seating of this juror while permitting a white juror to be empaneled who had the same characteristics objected to in the struck juror. In support of this position, McMillon relies on *Reynolds v. Benefield*, 931 F.2d 506, 512 (8th Cir.1991), which stated that "the government may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar charac-

# 954

## III

■ McMillon assigns error to the admission into evidence of five pieces of testimony, arguing that each should have been excluded under Federal Rule of Evidence 404(b). We review admission of 404(b) evidence by inquiring whether the district court acted in a way that was so "arbitrary or irrational," *United States v. Rawle*, 845 F.2d 1244 (4th Cir.1988), that it can be said to have abused its discretion. *United States v. Mills*, 995 F.2d 480, 485 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 283, 126 L.Ed.2d 233 (1993); *United States v. Mark*, 943 F.2d 444, 447 (4th Cir.1991).

### A

Three of the challenged statements were from co-conspirators who had entered plea agreements with the government. Rodney Williams testified that until McMillon left the Washington, D.C. area for Florida after the 1989 raid on her house, he had been selling approximately one ounce of crack cocaine each week for her and her husband. He testified that he got crack cocaine directly from Ms. McMillon approximately three times, each time at Antoinette Williams' house. Antoinette Williams testified that she met McMillon in 1980, that McMillon was selling drugs at that time, and that in 1987 Julia McMillon and her husband moved into Williams' house and began selling drugs out of it. Finally, Jacques Beckwith testified in response to a question from the court that he started obtaining drugs from McMillon in 1982 or 1983, and also that in April or May of 1990 he and McMillon traveled to Minneapolis to sell drugs in that city before relocating to the Washington, D.C. area.

In addition, Corporal John Bartlett of the Prince George's County Police Department testified that while executing a search warrant at the McMillons' residence in early 1989, he encountered Ms. McMillon flushing some items down the toilet, and that McMillon told him that the items were cocaine and that she was flushing it because her husband told her the police were coming and she should flush the cocaine. Following the evidence, the judge gave a limiting instruction to the jury.

Finally, Agent Steve Shillingford of the Fairfax County Police Department testified that McMillon filed for voluntary Chapter 13 bankruptcy in 1989 with debts of $144,945.71 and subsequently made monthly payments to the trustee and other secured parties in the amount of $2,819.88 through the period of the indicted conspiracy.

### B

Federal Rule of Evidence 404(b) [6] prohibits the use of "evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity or knowledge." *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). Thus, "[t]he threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *Id.* at 686, 108 S.Ct. at 1499. While 404(b) is viewed as an inclusionary rule, *Mark*, 943 F.2d at 447, evidence of prior bad acts is not admissible if it is introduced for the sole purpose of proving criminal disposition. *United States v. Russell*, 971 F.2d 1098 (4th

---

teristics are also challenged." *Benefield* is not the law of this circuit; however, even if it were, the burden rests on the defendant to bring forth evidence showing that the government's strikes were used inconsistently. Here, while defense counsel argues in his briefs on appeal that one of the seated members of the jury met the characteristics of the struck juror, there was no evidence introduced into the record on this point. Given these circumstances, it would be improper to address the rule of *Benefield* on its merits.

**6.** Federal Rule of Evidence 404(b) provides that

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Cir.1992), *cert. denied*, ——— U.S. ———, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993).

In *Rawle*, this court developed a three-part test to evaluate the admissibility of particular evidence under Rule 404(b). 845 F.2d at 1246–47. Evidence is admissible under 404(b) if it is relevant to an issue other than character; necessary, which means that it is an essential part of the crimes on trial, or where it furnishes part of the context of the crime; and reliable. It also must pass the Rule 403 balancing test.

■ We believe that the testimony of Rodney Williams, Antoinette Williams and Jacques Beckwith satisfies these requirements. As revealed in the brief statement of the facts at the outset, the drug conspiracy in which these individuals participated was fairly extensive and involved an intricate chain of distribution, with Ms. McMillon acting as the local chief. All the testimony challenged here was elicited as part of the groundwork that the government needed to lay to explain to the jury how these individuals fit into the operation of this conspiracy. McMillon generally only participated in the drug trade from behind the scenes. Each of these three persons acted in some capacity within this drug ring, and their testimony was helpful in providing the jury with an understanding of how they knew McMillon and how it came about that they were trusted brokers or other participants in her dealings. This testimony helped "explain to the jury how the illegal relationship between participants in the crime developed." *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir.1990), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). In reviewing all the evidence introduced and the limiting instructions that the judge gave to the jury concerning 404(b) evidence, we do not believe that the district judge abused his discretion in allowing this evidence under either Rule 404(b) or Rule 403.

■ Similarly, we do not believe that it was error to admit the evidence of a prior bankruptcy filing or payments made thereafter. While "an act need not be criminal, so long as it tends to impugn a defendant's character" to fall within Rule 404(b), *Rawle*, 845 F.2d at 1247, we do not believe that a bankruptcy filing falls within the scope of Rule 404(b) under these circumstances. In a prosecution for certain crimes a defendant might want to prevent the government from introducing evidence of a prior bankruptcy filing because it would allow the jury to infer "action in conformity therewith." In this instance, that danger is severely attenuated because of the wide divergence between the contested act, a bankruptcy filing, and the charged offenses. In addition, the evidence of payments on the bankruptcy is not in itself a bad act, and "evidence of unexplained wealth is relevant in a narcotics prosecution as evidence of illegal ·dealings and ill-gotten gains." *United States v. Grandison*, 783 F.2d 1152, 1156 (4th Cir.), *cert. denied*, 479 U.S. 845, 107 S.Ct. 160, 93 L.Ed.2d 99 (1986).

■ The final piece of contested testimony is that of Corporal Bartlett. His testimony is much more problematic under Rule 404(b) because the events involved occurred well outside the charged dates of the conspiracy and were not directly related to the current conspiracy. As such, the statements he related cannot be said to "bear[ ] upon a relevant issue in the case," *Huddleston*, 485 U.S. at 685, 108 S.Ct. at 1499, because they do not assist the jury in determining McMillon's *mens rea* in the *instant* conspiracy. Even if this piece of testimony does not meet the standards for admission under Rule 404(b), however, a review of the entire record and overwhelming evidence against Ms. McMillon convinces us that its introduction constituted harmless error, since it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent this testimony. *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Alston v. Garrison*, 720 F.2d 812, 817 (4th Cir.1983), *cert. denied*, 468 U.S. 1219, 104 S.Ct. 3589, 82 L.Ed.2d 886 (1984).

## IV

■ Finally, McMillon assigns error to the district court's ruling preventing her attorney from cross examining Jacques Beckwith on certain topics. As an evidentiary matter, we review the district court's ruling only to determine whether it has abused its discre-

tion. *United States v. Gravely*, 840 F.2d 1156, 1162 (4th Cir.1988).

At a bench conference directly prior to cross examination of Beckwith, defense counsel indicated that he intended to obtain testimony that Beckwith used drugs in order to force people to engage in sexual acts with him and that he used and manipulated them based on their addiction and his access to drugs. That the people allegedly manipulated were men is worth noting, for a review of the transcript discloses that it was part of the defense strategy to highlight Beckwith's sexuality as part of the effort to impeach his credibility. The government objected to this line of questioning, and the district judge sustained the objection.

■ Under Federal Rule of Evidence 611(b), "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." When credibility is the issue, as in this instance, under Rule 608(b), specific instances of the conduct of a witness may be inquired into on cross-examination only if probative of truthfulness or untruthfulness.

■ In a criminal context, cross-examination is an important element of the right of confrontation. *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). But while it is "essential to a fair trial," *United States v. Cole*, 622 F.2d 98 (4th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 221 (1980),

> [t]he trial court is vested with broad discretion to control the mode of interrogation and presentation of evidence to insure that witnesses are treated fairly and the search for truth is not impaired by presentation of extraneous, prejudicial or confusing material.

*United States v. Gravely*, 840 F.2d 1156 (4th Cir.1988). Indeed, "there is a duty to protect [the witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him." *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931).

McMillon argues on appeal that the prohibited inquiry met these standards because it was probative of Beckwith's truthfulness.

We disagree. The cornerstone for McMillon's argument is the contention that Beckwith portrayed himself in his direct testimony as being manipulated by McMillon. This, it is argued, allows the defense to show that Beckwith himself is a manipulator. The first difficulty lies in the fact that a review of the transcript shows that Beckwith admired and at times adulated McMillon as a wealthy, successful black woman, not that he portrayed himself as manipulated by her. The second difficulty with this approach is that it simply strays too far from the matter at hand: the testimony regarding Beckwith's sexual life is not probative of his character for truthfulness. Instead, it is exactly the type of cross-examination strategy, warned against in *Gravely* and *Alford*, that impairs the search for the truth and harasses, annoys or humiliates the witness in the process.

*AFFIRMED.*