**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 95-5590

LERRY BLOTCHER, a/k/a Boogie, a/k/a
Larry Blutcher, a/k/a Troy Wilson,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Chief District Judge.
(CR-94-149-F)

Argued: May 10, 1996

Decided: August 7, 1996

Before WIDENER and MURNAGHAN, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed in part and remanded in part by unpublished per curiam
opinion. Judge Widener wrote a concurring and dissenting opinion.

_____

**COUNSEL**

**ARGUED:** William Webb Plyler, MCMILLAN, SMITH &
PLYLER, Raleigh, North Carolina, for Appellant. John Samuel
Bowler, Assistant United States Attorney, Raleigh, North Carolina,
for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States
Attorney, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted defendant-appellant Lerry Blotcher ("Blotcher") of one count of conspiracy to distribute crack cocaine. Blotcher appeals his conviction and sentence on various grounds. For the following reasons, we affirm in part and remand in part.

I.

A. <u>The Arrest</u>

Blotcher and his codefendant Bernard Hedgepeth engaged in the wholesale distribution of crack cocaine in the Raleigh, North Carolina area. On August 30, 1994, police surveillance of Blotcher and Hedgepeth resulted in their arrest. After the police had witnessed the two men engage in a number of activities suggesting drug-dealing, a marked police car stopped a rental car that Blotcher was driving. Hedgepeth, who was in the passenger seat, jumped from the car before it stopped and ran across several lanes of traffic, throwing away bags of crack cocaine and swallowing what he could not throw away. Approximately 98 grams of crack cocaine were recovered from the ground where they had been thrown and from Hedgepeth. Hedgepeth also swallowed approximately one ounce of crack cocaine.

Because he had swallowed so much crack cocaine, Hedgepeth had to be taken to the hospital to have his stomach pumped. The crack cocaine affected his behavior such that he was very erratic and had to be physically restrained to be treated. He also made many statements while he was in that erratic state, including one about how he had done the wrong thing and gotten his friend Blotcher in trouble. He stated that Blotcher "didn't know anything about the cocaine." At trial, however, Hedgepeth testified that he did not remember making those statements. In cooperation with the government, he further testi-

2

fied that Blotcher knew about the drugs and that he and Blotcher had been in the drug business together. Additionally, five drug dealers, who had participated in drug dealings with Blotcher or had direct knowledge of his drug dealing, testified as to Blotcher's drug-dealing activities.

No drugs were found on Blotcher or in the rental car. No drugs were found in the two apartments used by Blotcher and Hedgepeth. The only evidence of drugs found at either apartment consisted of one officer's testimony as to what he found in a kitchen sink. On a counter beside the sink was baking soda, which is used to cook crack cocaine. In the sink were a few white flakes in a milky white residue. The officer testified that the residue tested positive for cocaine in a field test he conducted. He, however, used the entirety of the residue in the field test so that there was no remaining portion to send to the laboratory for further more reliable chemical tests. The officer also threw away the field-test kit he used, thus, it could not be examined by the defense.

B. <u>Voir Dire</u>

At trial, during the first round of voir dire, the government did not exercise any peremptories. Blotcher, who is black, however, challenged six jurors--all of whom were white. After the third challenge, the government raised a <u>Batson</u> objection based on pattern.[1] The court allowed Blotcher's attorney to continue, with the government raising a <u>Batson</u> objection after each strike. After the fifth strike of a white juror, however, the court entertained the government's <u>Batson</u> challenge and asked Blotcher's counsel to state his reasons for striking the five white jurors. Blotcher's counsel responded:"I've discussed it with my client . . . [he] has told me that these are the people that he does not want on his jury." The district judge responded that he would let Blotcher finish all of his challenges and then return to the issue.

Blotcher continued with his challenges and dismissed an additional white juror--six total. The district judge reminded Blotcher's counsel that <u>Batson</u> cuts both ways and, therefore, requested explanations for

_____

[1] **<u>Batson v. Kentucky</u>**, 476 U.S. 79 (1986).

3

why Blotcher was exercising a peremptory strike as to each of the six white jurors.

As to the first stricken juror, Blotcher recalled that she had made a statement about her dislike of drugs. The court and the prosecution accepted that reason. As to four of the jurors, Blotcher objected to them because they were older and he felt, therefore, could not relate with him as well as younger jurors. The court and prosecution accepted that reason as well. As to the sixth juror, Harold Hedgepeth (no relation to Blotcher's codefendant Hedgepeth), Blotcher sought to strike him based on his appearance as a "conservative type" person. The prosecution responded by arguing that there was nothing more conservative about juror Hedgepeth's appearance than any other juror on the panel. The district court agreed and simply refused to strike juror Hedgepeth, finding that his appearance was not more conservative than any one else on the panel and that Blotcher's reason was not rational.

Subsequently, after another round of jury selection in which Blotcher exercised three additional peremptory strikes, the court revisited the Hedgepeth strike.[2] The district court specifically found that juror Hedgepeth was not dressed conservatively. The court explained that juror Hedgepeth was wearing a sport shirt. The district court further found that juror Hedgepeth was not older, a basis for four of the other strikes. The court, therefore, found that Blotcher's explanation was pretextual and lacked validity. Nonetheless, the court stated that it would be glad "to make further inquiry" if Blotcher desired.

Blotcher's counsel attempted one more time to articulate a reason for striking juror Hedgepeth. He explained: "He's got his hair kind of nice and he's got nice glasses on." The government responded by pointing out that no black jurors had been challenged, despite the fact that some wore ties. Without addressing Blotcher's further elaboration that juror Hedgepeth had his hair fixed nicely and wore nice glasses, the court brought the matter to a close by simply finding without further explanation that Blotcher's reason was pretextual.

_____

[2] The government did not challenge the three additional strikes.

4

C. Admission of Field-Test Results for Cocaine

Prior to evidence being received, Blotcher made a motion in limine as to the narcotics field test conducted by an officer on the few white flakes the officer allegedly found in the kitchen sink. The court reserved on the issue. During trial, a chemist from the State Bureau of Investigation testified that the color testing used in the field test gives a valid preliminary indication of the presence of cocaine. On that basis, the court ruled that the field test had sufficient validity as indicating, although not conclusively, the presence of cocaine. The district court also noted that the tests were commonly used. The test results were also somewhat cumulative--a reasonable juror could conclude that the white flaky residue found in the apartment was cocaine based on the testimony of five individuals that Blotcher sold cocaine and the fact that Blotcher used the apartment, even in the absence of the field test.

The jury found Blotcher guilty of conspiracy to distribute crack cocaine, but acquitted him of the distribution counts. The district judge sentenced Blotcher to 235 months in prison. Blotcher appeals his conviction and sentence.

II.

Blotcher seeks reversal of his conviction and sentence on three different grounds: (1) the refusal to strike juror Hedgepeth on whom he sought to exercise a peremptory strike; (2) the admission of testimony regarding a positive field test for cocaine in an apartment allegedly used by Blotcher for his drug-dealing activities; and (3) the disparity in his sentence for dealing crack cocaine versus what it would have been if he had been dealing powder cocaine. We address each in turn.

A. Batson Challenge

A party to a lawsuit cannot exercise peremptory strikes on the basis of race. See, e.g., Powers v. Ohio, 499 U.S. 400 (1991); Batson v. Kentucky, 476 U.S. 79 (1986). It is a well-settled principle of constitutional law that a criminal defendant's exercise of a peremptory jury challenge on account of race, just as the use of a peremptory chal-

5

lenge based on race by the prosecution or a civil litigant, violates the equal protection rights of the prospective juror and the opposing party has standing to object in order to raise the excluded person's rights. See generally, Georgia v. McCollum, 505 U.S. 42 (1992); Powers v. Ohio, 499 U.S. 400 (1991); Jones v. Plaster , 57 F.3d 417, 420 (4th Cir. 1995). Such an objection is commonly referred to as a Batson challenge. See Batson v. Kentucky, 476 U.S. 79.

When a Batson challenge is made, the court must conduct a three-part inquiry. First, the court requires the opponent of the challenge to make out a prima facie case of racial discrimination. Second, if the requisite showing is made, the burden then shifts to the proponent of the strike to come forward with a race-neutral explanation for striking the juror in question. The second step of the inquiry does not require that the explanation be persuasive or even plausible. Purkett v. Elem, 115 S. Ct. 1769, 1770-71 (1995). The proffered reason "need not be worthy of belief or related to the issues to be tried or to the prospective juror's ability to provide acceptable jury service." Jones, 57 F.3d at 420. All that is required is that the reason be race-neutral. Purkett, 115 S. Ct. at 1791. Third, if steps one and two are met, the trial court must then decide whether the explanation is pretextual and whether the opponent of the strike has met its burden of proving purposeful discrimination. Id. at 1770-71; Batson , 476 U.S. at 96-98. The ultimate burden rests always with the opponent of the strike to demonstrate purposeful discrimination.

The Batson three-step analysis, thus, requires a "finding of fact" as to "discriminatory intent." Hernandez v. New York, 500 U.S. 352, 364 (1991). The findings of the district court turn largely on credibility determinations and are, therefore, given great deference and reviewed for clear error. Id.; Jones, 57 F.3d at 421. However, where the district court fails to articulate adequately its findings, remand for further proceedings may be necessary. Jones, 57 F.3d at 421; see also United States v. Joe, 928 F.2d 99, 103-04 (4th Cir.), cert. denied, 502 U.S. 816 (1991) (remanding where district court failed to make necessary Batson factual findings).

Blotcher contends that the district court erred in its Batson inquiry because it conflated steps two and three. He argues that the district judge erroneously required his explanation at the second step to be

6

not merely race-neutral, but rational as well. Furthermore, he contends that the prosecution failed to meet its burden of proving purposeful discrimination.

In Purkett, the Supreme Court found that a court erred when it combined the second and third steps into one. A court could not require the explanation offered at the second step to be more than race-neutral. The Court explained that the second step requires that the party seeking to strike a juror do more than merely state he lacked a discriminatory motive or merely affirm his good faith. Id. at 1771. It requires the proponent of the strike to state a race-neutral reason. The second step, however, does not require that the proponent of the strike state "a reason that makes sense," but merely that the reason be legitimate, i.e., not based on race. Id.  To require more than a race-neutral reason would be inconsistent with the principle that the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. Id. Only at the third step should the court evaluate the persuasiveness of the justification. Id.

As described previously, the district court's Batson inquiry was convoluted. We find the record so unclear that we cannot determine whether the district court applied the proper legal analysis in sustaining the prosecution's Batson objection to Blotcher's peremptory strike against juror Hedgepeth.

While the district court clearly undertook some sort of Batson analysis, the record as it exists does not indicate that he properly went through the required three-part analysis or reached the ultimate finding as to whether the prosecution met its ultimate burden of proving purposeful discrimination. The district court failed to make the requisite Batson findings. First, the district court failed to make a factual finding as to whether a prima facie case was made.**3** Second, the dis-

_____

**3** The failure to make a prima facie finding of discrimination is moot where the proponent of the strike proceeds to offer a race-neutral reason and the district court makes a ruling on the ultimate question of intentional discrimination. Hernandez, 500 U.S. at 359. Here, Blotcher offered a race-neutral reason, but the record is unclear as to whether the district court correctly made the ultimate finding of intentional discrimination.

7

trict court failed to rule clearly on whether Blotcher's proffered reason for striking juror Hedgepeth was race-neutral. There is no statement or finding to that effect. The only finding by the district court is that the reason proffered was not true, lacked validity, and was pretextual. That sort of inquiry is inappropriate at the second step. As explained earlier, the reason proffered by the proponent of the strike need not even be worthy of belief, it need only be race-neutral. Jones, 57 F.3d at 420.**4**

Finally, the record is unclear as to whether the district judge sufficiently addressed whether the prosecution had met its ultimate burden of proving that the strike was racially motivated. The district judge found that Blotcher's alleged neutral reasons were pretextual and lacked validity. He did not believe them. Pretextuality alone, however, does not automatically demonstrate purposeful discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 510-11, 518-19 (1993) (explaining in the Title VII context that once a prima facie case is made and it is rebutted, "the fact finder must then decide not . . . whether the evidence of rebuttal is credible, but whether" there has been intentional discrimination); United States v. McMillon, 14 F.3d 948, 952 n.3 (4th Cir. 1994) (noting applicability of St. Mary's holding to the Batson inquiry). Thus, an ultimate fact finding of intentional discrimination must be made. That factual finding is absent from the record.

_____

**4** Furthermore, just as the Supreme Court observed in Elem that the growing of long, unkempt hair is not particular to any race, 115 S. Ct. at 1771, neither is the wearing of hair in a "kind of nice" way, the wearing of "nice glasses," nor a generally conservative appearance particular to any race. Those reasons are race-neutral. All the prosecution did to rebut those reasons was indicate that every single juror on the panel was neatly and well dressed and that there was nothing about juror Hedgepeth's dress that indicated he was in any way more conservative than anyone else on the panel. The district court agreed and found the reason pretextual. The mere fact, however, that an acceptable juror possesses the same characteristic as a juror a party seeks to strike does not in and of itself mean that the reason is pretextual. The acceptable juror may have possessed other desirable characteristics. Many factors, such as general appearance, demeanor, education, employment, and others, may properly enter into the jury selection process. United States v. Lane, 866 F.2d 103, 106 (4th Cir. 1989).

8

Based on the confusion in the transcript and the absence of the necessary <u>Batson</u> findings, we remand for further proceedings in order for the district court to clarify its ruling. <u>See</u>, <u>e.g.</u>, <u>Jones</u>, 57 F.3d at 421-22.

B. <u>Admissibility of Field Test</u>

Blotcher challenges the testimony from an officer regarding the results of the field test he conducted. Blotcher argues that the testimony should not have been allowed because: (1) the government failed to comply with Rule 16(a)(1)(C)(D)(E) of the Federal Rules of Criminal Procedure regarding discovery; (2) the test itself was insufficiently reliable to meet the standards of Rule 702 of the Federal Rules of Evidence; and (3) the prejudicial effect of the testimony outweighed its probative value in violation of Rule 403 of the Federal Rules of Evidence.

1. Rule 16

Among Rule 16's requirements, the government must, upon the defendant's request: (1) permit the defendant to inspect and copy documents and the like, which are in the government's possession and material to the preparation of the defense; (2) permit the defendant to inspect and copy any results of scientific tests, which are in the government's control and material to the preparation of the defense; and (3) disclose to the defendant a written summary of testimony the government intends to use under Rule 702 of the Federal Rules of Evidence. Fed.R.Crim.P. 16(a)(1)(C)(D)(E).

During discovery, Blotcher requested the government to disclose the results and reports of any scientific tests and experiments, all expert conclusions and analysis concerning any physical evidence, and the name, address, and qualifications of any expert witness intended to be called by the government. The government provided the following statement from a detective's report:

> While searching the residence, Det. Sholar observed white powder residue in the kitchen sink and found a knife located on the kitchen counter. I witnessed Det. Sholar field test the

9

white powder substance. The substance tested positive for cocaine.

Blotcher contends that Rule 16 was violated. He has not specified what exactly he contends should have been turned over. The transcript of argument indicates that he objected to the absence of lab reports and his inability to test the substance. There were, however, no lab reports, nor was there any substance remaining for him to test because the entirety of the small residue found in the sink was used in the field test. The transcript further indicates that Blotcher objected to the failure to notify him of "expert" testimony regarding the field test. The government intended for detective Sholar to testify at trial as to the results of the field test and Blotcher was on notice that Detective Sholar had conducted a test which was positive for cocaine. The government brought in an expert witness on the field test only after Blotcher raised his motion in limine before trial and the district judge indicated that under Rule 702 of the Federal Rules of Evidence, he might need to examine the reliability of the field test. Thus, the government did not violate Rule 16. Blotcher was on notice of the only evidence relating to the field test that the government had or intended to present at trial--Detective Sholar's testimony as to what he found in the sink and the results of the field test he conducted.

2. Rule 702

Rule 702 provides that scientific, technical, and other specialized knowledge is admissible at trial if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The Supreme Court has set forth a two-part test that must be met for scientific evidence to be admissible under Rule 702--the trial judge must ascertain that the evidence is (1) relevant and (2) reliable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590-91 (1993). Reliability must be based upon scientific validity of some sort, depending on what the evidence seeks to demonstrate and various other factors. Id. at n.9.

The Fourth Circuit has explained the Daubert test as requiring: (1) that "the expert testimony must consist of `scientific knowledge'-- that is, the testimony must be supported by appropriate validation, and (2) the evidence or testimony must `assist the trier of fact to

10

understand the evidence or to determine a fact in issue.'" <u>United States v. Powers</u>, 59 F.3d 1460, 1470-71 (4th Cir. 1995) (citing <u>United States v. Dorsey</u>, 45 F.3d 809, 813 (4th Cir.) (quoting <u>Daubert</u>, 509 U.S. at 590-91), <u>cert. denied</u> , 115 S. Ct. 2631 (1995)), <u>cert. denied</u>, 116 S. Ct. 784 (1996) (emphasis in original). The types of factors that trial courts should consider when evaluating scientific validity are: (1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used; and (4) the degree of the method's or conclusion's acceptance within the relevant community. <u>Powers</u>, 59 F.3d at 1471. The inquiry, however, is a flexible one which depends greatly on the type of evidence and what it is offered to demonstrate. We review a district court's determination to admit evidence under Rule 702 for abuse of discretion. <u>Id.</u>

During trial, the district court conducted an examination of a state bureau of investigation forensic chemist in order to determine the reliability of the field test. The chemist testified that the field test consisted of a glass vial containing two ampules--one of liquid and one of acid. When a substance is placed in the vial, the ampules are broken. If the liquid turns blue, the test "may indicate the presence of cocaine." The test is commonly used nationwide by police officers in the field. An identical test is often conducted in the laboratory. However, such color tests are nonspecific. Thus, the particular field test is not a conclusive indication of cocaine, but rather merely an indication that cocaine may be present. The expert considered such a test preliminary, the type of test that gives some indication as to what other test should be pursued to establish conclusive proof that a particular drug is present.

The district court ruled that it would allow the officer who conducted the field test to testify as to its results because the field test was customarily used by officers in the field and reliably (although not conclusively) indicated the presence of cocaine. The court also reasoned that a reasonable juror could conclude that the substance was cocaine after five people testified that Blotcher distributed crack cocaine and a police officer testified that he found a white substance with pebbles in an apartment used by Blotcher, even without the test. The court, therefore, found that the officer's testimony as to a field

11

test was admissible to the extent that it tended to confirm the presence of cocaine.

To the extent there is a debate over the reliability of the particular test at issue, those questions go to the evidence's weight, not its admissibility. Thus, we conclude that the district court's admission of the police officer's testimony regarding the results of his field test was not an abuse of discretion. Cf. United States v. Paiva, 892 F.2d 148, 160 (1st Cir. 1989) (allowing detective with experience in narcotics unit to testify as expert under Rule 702 that in his opinion the substance he field tested was cocaine).

3. Rule 403

Blotcher also argues that the testimony violated Rule 403 of the Federal Rules of Evidence in that its prejudicial effect outweighed its probative value. As long as the test is scientifically admissible, the probative effect of its results tending to confirm the presence of cocaine is quite strong. While the prejudicial effect is quite potent also, it does not outweigh the probative value of the test results.

C. Disparity Between Crack Cocaine and
Powder Cocaine Sentences

Finally, Blotcher challenges the constitutionality of his sentence under the equal protection clause. He argues that the disparity in sentences between those imposed on individuals convicted of dealing cocaine powder versus those convicted of dealing crack cocaine violates his constitutional rights. He relies on a recent report by the United States Sentencing Commission which concludes that the disparity is not rational. We have previously considered those same arguments and rejected them, finding that the sentencing commission report has no effect on our earlier holding in United v. Thomas, 900 F.2d 37, 39-40 (4th Cir. 1990), that Congress could have rationally concluded that the disparity was justified. United States v. Hayden,___ F.3d ___, ___, 1996 WL 287799 (4th Cir. May 31, 1996).

For the foregoing reasons, we affirm Blotcher's conviction and sentence as to all grounds he has raised on appeal, with the exception

12

of the district court's refusal to allow him to exercise a peremptory strike on juror Hedgepeth. As to that refusal, we remand for further clarification.

AFFIRMED IN PART AND REMANDED IN PART

WIDENER, Circuit Judge, concurring and dissenting:

I concur in the opinion so far as it affirms the conviction and sentence as to all grounds except the district court's refusal to allow Blotcher to exercise a peremptory strike on juror Hedgepeth.

I also concur that the case should be remanded. Where I part company is that I think the conviction should be vacated on account of the Hedgepeth strike and a new trial granted.

Blotcher told his attorney, in giving a reason for the peremptory challenge of Hedgepeth that:

> Mr. Hedgepeth, he simply says appears to be a very-- just from his appearance, a conservative person.

* * * *

> But from his appearance, he would appear to be a conservative type person, which we believe would not be the best juror in this case for him.

The government objected on the ground that "There is nothing about Mr. Hedgepeth's dress that is in any way more conservative than anyone else's on that jury."

At that time there were four black people and eight white people on the jury. The court left Hedgepeth on the jury, stating: "Well, I don't see any rational reason for getting Mr. Hedgepeth off."

The court noted that Hedgepeth was not dressed conservatively because: "He has a sport shirt on." But the defendant's attorney responded that Hedgepeth has ". . . got his hair kind of nice and he's

13

got nice glasses on." The government entered the argument with the comment that "Not one single black juror has been struck by the defendant regardless of the fact that some of them have ties on," thus revealing the real basis for the government's objection. It wanted to bar Blotcher from striking any more white jurors.

The court held that "Comments that he [Blotcher] made concerning not wanting conservative people w<u>as</u> [sp] pretextural." With that, the matter was dropped, Blotcher was convicted, and this appeal is the result.

I think that Blotcher wanting to strike the people on the jury who appeared to him to be conservative was not pretextural. Everyone on the jury was "neatly and well dressed" according to the government's attorney. So the striking of any other white juror, except perhaps the most conservatively dressed on the whole jury, would have been error according to the rule we apply in this case.

The record simply does not show the objection was pretextural, which I think is required.

14