PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

v.

RANDOLPH WILLIAMS, a/k/a Red,

    *Defendant-Appellant.*

No. 09-4049

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
Henry M. Herlong, Jr., District Judge.
(7:08-cr-00025-HMH-1)

Argued: September 21, 2010

Decided: January 21, 2011

Before GREGORY and KEENAN, Circuit Judges, and
James C. DEVER III, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

Vacated and remanded by published opinion. Judge Gregory
wrote the majority opinion, in which Judge Keenan joined.
Judge Dever wrote a separate opinion concurring in part and
dissenting in part.

## COUNSEL

**ARGUED**: Andrew Mackenzie, BARRETT & MACKEN-
ZIE, LLC, Greenville, South Carolina, for Appellant. Robert

Frank Daley, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** W. Walter Wilkins, United States Attorney, Columbia, South Carolina, for Appellee.

---

## OPINION

GREGORY, Circuit Judge:

A jury convicted Randolph Williams of conspiracy to possess with intent to distribute heroin in contravention of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846. Williams appeals his conviction because of a stipulation which was published to the jury over his objection. He argues that this error impinged on his Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. VI. We agree and therefore vacate his conviction.

I.

On January 8, 2008, Williams was indicted by a grand jury for conspiracy to possess with intent to distribute heroin from September 25, 2007, to October 10, 2007 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846. Two co-defendants, Sabrina Hutchinson and Victor Jackson, were also indicted as members of the conspiracy. Subsequent to the indictment, Williams pled not guilty, charges were dropped against Sabrina Hutchinson, and Victor Jackson pled guilty.

On September 3, 2008, the district court held a hearing to discuss pretrial matters for Williams' trial. The Assistant United States Attorney informed the court that she wished to enter a stipulation regarding the testing of the drugs at issue. She advised the court that the "defendant refuses to sign the stipulation." J.A. 11. Williams' defense attorney then asked the court if it "had[ ] any problem with [her] signing the stipu-

lation over the objection of the defendant?" J.A. 11. The court allowed the defense attorney to sign the stipulation and it was read to the jury.

During the trial, the government presented its theory of the crime. According to the government, the package of heroin was shipped from drug producers in Panama to the Louisville International Airport in Kentucky where it was intercepted by law enforcement. From there, if it had not been intercepted, the package would have been shipped to Sabrina Hutchinson's house in Spartanburg, South Carolina where Victor Jackson would retrieve it, and then deliver the package to Williams. Williams, according to the government, planned to distribute the heroin thereafter.

In support of its theory the government introduced several pieces of evidence. First, the United States introduced the testimony of Officer Eric Murphy from the Customs and Border Protection Agency, who explained how the alleged heroin arrived from Panama and caught his attention. Officer Murphy subsequently conducted a field test which was positive for heroin.

Second, Victor Jackson, who was Williams' indicted co-defendant, testified that he was asked by Williams to retrieve the package in exchange for $500. During cross examination it was revealed that Jackson initially lied to police about his identity and would likely have his sentence reduced based on his testimony.

Following this testimony, the government published the stipulation by reading it to the jury[1]:

> *United States of America vs. Randolph Williams also known as Red*, Criminal No 7:08-25, the Govern-

---

[1]The written and signed copy of the stipulation has been lost and so we rely on the transcript for language of the stipulation.

ment and counsel for the defendant, Randolph Wil-
liams, that counsel being Lora Collins stipulate the
following: that on October the 11th of the 2007 [sic]
lieutenant Beth Rampey Vaughn a certified forensic
chemist with the Spartanburg County Sheriff's
Office forensic laboratory located in Spartanburg,
South Carolina, examined and analyzed the contents
of the package addressed to Sabrina Hutchinson, 142
Westover Drive No. 5, Spartanburg, South Carolina,
29306 and seized by Eric Murphy of Customs and
Border protection Louisville Kentucky, that the
package was seized on October the 3rd of 2007 from
the UPS sorting facility and submitted to forensic
chemist Rampey Vaughn under ICE file No.
GV13HE08GV0C1[ ], that forensic chemist Rampey
Vaughn who has been qualified as an expert in the
analysis of controlled substances in both state and
federal courts within the District of South Carolina
determined that this – that the package contained a
total weight of 98.61–grams of heroin, a schedule I
controlled substance. We do so stipulate, signed by
Lora Collins, attorney for the defendant, and Assis-
tant United States Attorney Regan A. Pendleton in
Greenville, South Carolina.

J.A. 40-41. The government then introduced testimony by
Officer Brian Duncan. He testified that he dressed as a UPS
delivery man and delivered the package to Ms. Hutchinson's
house in order to ensure that Victor Jackson retrieve the pack-
age. Next Special Agent Paul Criswell testified as to the con-
tent of an alleged confession by Williams in which he detailed
the plan to retrieve and distribute the heroin. In cross-
examination, the defense pointed out that despite the custodial
nature of Williams' interrogation, no written statement was
ever taken. Furthermore, the defense raised questions about
whether Williams was under the influence of medication at
the time of the interrogation. The government also called

Investigator Matt Hutchins who verified much of Special Agent Criswell's testimony.

The defense called Williams to testify on his own behalf. Among other things, he testified that he was under the influence of the pain killer Percocet at the time of his interrogation by Investigator Hutchins and Special Agent Criswell. He also contradicted earlier statements regarding any admissions he allegedly made to law enforcement. Finally, the government called Sabrina Hutchinson who indicated that she did not know and had never spoken with Williams.

In its charge to the jury, the court indicated that "[w]hen the attorneys on both sides stipulate or agree to the existence of a fact . . . you must, unless otherwise instructed, accept the stipulation as evidence and regard that fact as proved." J.A. 97. The court listed the required elements as (1) "an agreement existed between two or more persons to possess with the intent to distribute heroin"; (2) "defendant knew of the conspiracy"; and (3) "defendant knowingly and voluntarily became a part of the conspiracy." J.A. 102.

During their deliberation, the jury returned several questions to the court including: "What amount of drugs does it take to qualify for distribution as opposed to self-use?" J.A. 109. The court replied by indicating that the jury should use common sense but that the more drugs there are, the more likely it is that there is an intent to distribute. The court then retrieved the stipulation, marked it as the court's exhibit no. 1, and sent it back with the jury. Later, the court gave the jury the so-called *Allen* charge to encourage them to reach a verdict and allowed them to go home for the night. The next morning, the jury returned a guilty verdict. The jury also found that Williams had intended to possess 98.61 grams of heroin.

Williams' sentencing guidelines were prepared relying on a determination that he intended to possess 98.61 grams of

heroin. After disposing of some other objections, the court imposed a sentence of 78 months which was at the top of the guideline range. Williams timely filed a notice of appeal.

## II.

This Court reviews evidentiary rulings implicating constitutional claims de novo. *United States v. Abu Ali*, 528 F.3d 210, 253 (4th Cir. 2008), *cert. denied*, 129 S. Ct. 1312, (2009) (citing *United States v. Rivera*, 412 F.3d 562, 566 (4th Cir. 2005).

If we conclude that there is a constitutional violation, then evidentiary rulings of this kind are subject to harmless error review. Erroneously admitted evidence is harmless if a reviewing court is able to determine that "the constitutional error was harmless beyond a reasonable doubt." *United States v. Abu Ali*, 528 F.3d 210, 256 (4th Cir. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

## III.

## A.

Both parties agree that the district court abused its discretion by admitting the stipulation into evidence over Williams' objection because it violated his right to confront witnesses under the Sixth Amendment:

> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Crawford v. Washington*, 541 U.S. 36, 61 (2004). Though neither party cites to a case from the Fourth Circuit, both parties cite relevant cases from outside of this Circuit which have held that where a defendant objects to the introduction of a stipulation that is nonetheless introduced at trial, a district court abuses its discretion. *See e.g. Hawkins v. Hannigan*, 185 F.3d 1146, 1155 (10th Cir. 1999).

A majority of our sister circuits have held that "a defendant's attorney can waive his client's Sixth Amendment right so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *United States v. Cooper*, 243 F.3d 411, 418 (7th Cir. 2001) (citation omitted); *see also Janosky v. St. Amand*, 594 F.3d 39, 48 (1st Cir. 2010) (same); *United States v. Gamba*, 541 F.3d 895, 900 (9th Cir. 2008) ("defense counsel may waive an accused's constitutional rights as a part of trial strategy"); *United States v. Plitman*, 194 F.3d 59, 63 (2d Cir. 1999) (same); *United States v. Reveles*, 190 F.3d 678, 683 n.6 (5th Cir. 1999) (same); *Hawkins*, 185 F. 3d at 1155 (same).

However, other circuits have found that a defendant's waiver is required for an attorney to waive a Sixth Amendment right. *See Clemmons v. Delo*, 124 F.3d 944, 956 (8th Cir. 1997) ("the law seems to be clear that the right of confrontation is personal and fundamental and cannot be waived by counsel"), *cert. denied*, 118 S. Ct. 1548 (1998); *Carter v. Sowders*, 5 F.3d 975, 981 (6th Cir. 1993) ("there must be evidence in the record to support" a defendant's waiver of a Sixth Amendment right to confrontation for it to be valid).

While this Court is inclined to require that defendants make a clear waiver of their Sixth Amendment right, the Court need not reach this question here since both counsel and the district court were aware that Williams objected to the introduction of the stipulation. We can find no reasoning or case law that

would uphold a waiver of a Sixth Amendment right by defense counsel over a defendant's objection.

Therefore, we find that the district court erred when it accepted the stipulation over Williams' objection and violated his Sixth Amendment right.[2]

## B.

Next we must determine whether Williams is entitled to a new trial as a matter of law. To make this determination, this Court must consider whether the constitutional violation was harmless. An error will be deemed harmless if "the beneficiary of . . . [the] constitutional error [can] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967).

Williams argues that the introduction of the stipulation was not harmless. First, he argues that several pieces of evidence presented at trial would not have been admissible but for the stipulation. He also argues that the court's use of the stipulation to answer the jury's question about defining intent to distribute was highly prejudicial. The government argues that the error was harmless because the overwhelming uncontested evidence was sufficient to prove guilt.

We find that the harm from the stipulation extended far

---

[2]A stipulation may also be grounds for a violation of a defendant's right to a jury. A defendant has a right under the Fifth and Sixth Amendments to have a jury determine guilt beyond a reasonable doubt on every element of a charged offense. *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995) (United States Constitution "requires criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.") However, this Court need not reach whether or not Williams' right to jury trial was violated since we find as a matter of law that Defendant's Sixth Amendment right was violated.

beyond identifying the substance in the package. The harm from the stipulation falls into two broad categories. First, while styled as a stipulation, it essentially established an element of the crime. The government, having already secured a conviction against Jackson, established the chain of custody, and verified the identity and weight of the substance in the package, had very little left to prove.

Second, prejudice also derives from the jury using the stipulation to determine whether Williams had an intent to distribute heroin. The jury's question during deliberation "What amount of drugs does it take to qualify for distribution as opposed to self-use?" indicates that the jury was unresolved as to whether the government had met its burden of proof on the first element of the crime. In an effort to clarify the standard, the district court told the jury that "the larger the quantity of drugs increases the inference that drugs were possessed with the intent to distribute as opposed to personal use," and then gave the jury a copy of the stipulation. J.A. 112. The stipulation was the only evidence of the amount of heroin.

Here, it is not difficult to identify the harm caused by the stipulation. The district court handed the stipulation to the jury and thereby indicated that it was important in determining whether Williams had an intent to distribute heroin. Moreover, the stipulation was marked as the court's exhibit, giving it an air of reliability higher than other evidence presented to the jury. When an "answer to [a] jury's question [is] supplied by the trial judge" it is "thus stamped with the imprimatur of the court." *United States v. Ofray-Campos*, 534 F.3d 1, 25 (1st Cir. 2008) (finding that a judge's indication that co-defendants are incarcerated unduly prejudiced a jury verdict). Therefore the stipulation was essential to the jury's finding that Williams was guilty of intent to distribute.

We find that this prejudice alone is enough to require that the conviction be vacated. As a result of the clear prejudice stemming from the stipulation, this Court concludes that it

created pervasive prejudice and that the government cannot come close to proving that it was "harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991). Therefore, the Court finds that the conviction is vacated and this matter is remanded to the district court for further proceedings.

For the reasons explained above, we

*VACATE AND REMAND*

DEVER, District Judge, concurring in part and dissenting in part:

I agree with the majority that the district court violated the Confrontation Clause of the Sixth Amendment at trial in accepting the stipulation that the package seized at the Louisville airport contained 98.61 grams of heroin. I respectfully dissent, however, from the majority's conclusion that the error requires a new trial. Notably, the stipulation did not connect Williams to the seized package or inculpate Williams in the charged conspiracy in any way. Having reviewed the record in light of *Neder v. United States*, 527 U.S. 1 (1999), *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), and the substantive law of conspiracy, I would affirm the conviction. I describe the evidence and the events at trial at somewhat greater length than the majority in order to explain why it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder*, 527 U.S. at 18. Moreover, because the Confrontation Clause does not apply to the calculation of drug weight at sentencing, I also would affirm the sentence.

I.

The one-count indictment in this case states:

That beginning at a time unknown to the Grand Jury, but beginning at least on or about September 25,

2007, and continuing through October 10, 2007, in the District of South Carolina and elsewhere, the Defendants, RANDOLPH WILLIAMS, a/k/a "Red"; TIMOTHY RAY BYRD, a/k/a Victor Oneill Jackson; and SABRINA T. HUTCHINSON, knowingly and intentionally did combine, conspire and agree together and have tacit understanding with each other and various other persons, both known and unknown to the grand jury, to knowingly, intentionally, and unlawfully possess with intent to distribute a quantity of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C);

All in violation of Title 21, United States Code, Section 846.

J.A. 7.

Williams decided to go to trial and to make the United States prove the three elements of the charged conspiracy beyond a reasonable doubt:

(1) an agreement to possess heroin with the intent to distribute existed between two or more persons; (2) [Williams] knew of the conspiracy; and (3) [Williams] knowingly and voluntarily become part of the conspiracy.

*See United States v. Reid*, 523 F.3d 310, 315 (4th Cir. 2008). Williams's theory of the case was simple: he did not know of the alleged conspiracy or knowingly and voluntarily become part of the alleged conspiracy.

At a pre-trial hearing on the morning of the first day of trial, counsel for the United States and counsel for Williams stipulated that the testimony of the government's forensic chemist would show that the package seized at the Louisville

airport on October 3, 2007, contained 98.61 grams of heroin. J.A. 11, 40–41. Defense counsel agreed to stipulate that the seized package contained 98.61 grams of heroin as a trial strategy because Williams's theory of the case was that he did not know about the alleged conspiracy and was not part of the alleged conspiracy; therefore, the weight of the heroin "really doesn't matter." *Id.* at 11. Over Williams's objection, the district court accepted the stipulation. *Id.* at 11, 40–41.

On September 3, 2008, Williams's trial commenced. *Id.* at 17. Agent Eric Murphy, of U.S. Customs and Border Protection, testified first. *Id.* at 19–26. Murphy explained that he examined packages arriving into the United States from outside the United States and was assigned to the Louisville International Airport in Louisville, Kentucky. *See id.* at 19–20. On October 3, 2007, Murphy was alerted to a package shipped via United Parcel Service ("UPS") from Panama, which U.S. Customs views as a high risk country for drug smuggling. *Id.* at 21–22, 25. The package listed a return address in Windex, Panama and was addressed to Sabrina Hutchinson, 142 Westover Drive, Spartanburg, South Carolina. *Id.* at 22–23.

Murphy identified the package, and it was received into evidence. *Id.* at 22; Govt. Ex. No. 1. Murphy testified that on October 3, 2007, he opened the package and found an envelope inside. J.A. 22. Inside the envelope, he discovered a bag containing a substance that field tested positive as heroin. *Id.* at 23–25. Murphy also testified that drug smugglers commonly used the manner in which the substance was packaged to conceal controlled substances. *See id.* at 24. The package of heroin itself was admitted as an exhibit, and Murphy showed the package of heroin to the jury. *See id.*; Govt. Ex. No. 2.

After Murphy seized the heroin, he gave the package (including the package of heroin) to U.S. Immigration and Customs Enforcement ("ICE") agents in Louisville. J.A.

25–26. The ICE agents in Louisville, in turn, provided the seized package to ICE agents in South Carolina. *Id.*

Next, Victor Jackson testified. *Id.* at 27–39. Jackson testified that he had known Williams since he (Jackson) was 13 or 14 years old and that Jackson was now 43. *Id.* at 28. Jackson and Williams were friends and Jackson would sometimes drive Williams places and do errands for him. *Id.* Jackson had not been employed for about four or five years, lived with his girlfriend Sabrina Hutchinson at her residence in Spartanburg, and was addicted to crack cocaine. *Id.* at 29. Jackson also admitted that he had been convicted of distributing crack cocaine. *Id.*

Jackson admitted that he pleaded guilty to the conspiracy to possess with the intent to distribute a quantity of heroin charged in the indictment. *Id.* at 29–30. Jackson also admitted that he hoped that the prosecutor would make a motion to reduce his sentence due to his cooperation. *Id.* at 30.

Jackson then testified about the conspiracy. Jackson explained that Williams and he reached an agreement in the fall of 2007. *Id.* at 30. Specifically, Williams asked Jackson to receive a package addressed to Sabrina Hutchinson at Hutchinson's house. *Id.* Jackson knew that the package contained drugs. *Id.* at 31-32. Once Jackson received the package, Jackson agreed to call Williams to pick up the package. *Id.* at 31. In exchange for receiving the package, Williams agreed to pay Jackson $500. *Id.* Jackson told Hutchinson (who Jackson said was "a little slow") to be on the lookout for a package and to let Jackson know when it arrived. *Id.* at 32.

In early October 2007, Williams called Jackson and said that the package had been "intercepted" in Kentucky. *Id.* About three or four days after that phone call, a UPS van arrived at Hutchinson's residence. *Id.* at 33. Jackson was inside, peered out the window, and saw the UPS van. *Id.* Jackson immediately called Williams and told him what was hap-

pening. *Id.* Williams told Jackson to speak to the UPS driver, but not to sign for anything. *Id.*

While on the phone with Williams, Jackson opened the door. *Id.* The UPS driver (who really was Lieutenant Brian Duncan of the Spartanburg County Sheriff's Department) asked if Sabrina Hutchinson lived there, and Jackson said yes. *Id.* at 34–35. The UPS driver then handed the package to Jackson. *Id.* at 34. During his direct examination, Jackson identified Government Exhibit No. 1 as the package he received. *Id.*

After Jackson accepted the package, other officers exited the UPS van and arrested Jackson. *Id.* Jackson agreed to cooperate and called Williams. *Id.* at 35-36. Williams, however, did not answer his phone. *Id.*

On cross examination, Jackson admitted that he was a crack cocaine addict and had sold bootleg copies of CDs and DVDs to Williams. *Id.* at 37–38.

The prosecutor then read the stipulation to the jury. *Id.* at 40–41. Before the prosecutor read the stipulation, the court instructed the jury that "a stipulation . . . is an agreement between the attorneys for each side which you can accept as having been proven." *Id.* at 40. The stipulation stated that the prosecutor and defense counsel stipulate that a qualified, expert forensic chemist had examined the package seized from the UPS sorting facility on October 3, 2007, and the package contained 98.61 grams of heroin, a schedule I controlled substance. *Id.* at 40-41.

Next, Lieutenant Brian Duncan testified. *Id.* at 42-46. On October 9, 2007, Special Agent Paul Criswell and ICE notified Duncan that "a package had been found in Kentucky that contained heroin." *Id.* at 43. Criswell and ICE asked Duncan to dress up to resemble a UPS driver and to make a controlled delivery to 142 Westover Drive in Spartanburg. *Id.* Duncan

agreed. Thus, on October 10, 2007, Duncan posed as a UPS driver and delivered the package to Jackson. *Id.* at 42-43.

Duncan testified that when Jackson answered the door, Jackson was talking on the phone. *Id.* at 44. Duncan handed the package to Jackson. *Id.* at 43. Criswell and Investigator Matt Hutchins of the Spartanburg County Sheriff's Office then exited the van in which they had been hiding, and arrested Jackson. *See id.* at 44. Duncan, Hutchins, and Criswell then asked Jackson if he would cooperate. *Id.* Jackson agreed and tried to call Williams. *Id.* at 44-45. Williams, however, did not answer. *Id.* at 45.

Duncan then identified Government Exhibit No. 1 as the package that he delivered to Jackson on October 10, 2007. *Id.* Duncan also identified Government Exhibit No. 2 as the package of heroin contained inside Government Exhibit No. 1. *Id.*

On cross examination, Duncan admitted that Williams was not at the residence when Duncan delivered the package containing heroin to Jackson. *Id.* at 46.

Agent Paul Criswell then testified. *Id.* at 46-62. Criswell explained that he was an ICE agent assigned to Greenville, South Carolina. *Id.* at 47. On October 8, 2007, an ICE agent in Louisville, Kentucky contacted him and told him that ICE had intercepted a package of heroin in Louisville destined for Sabrina Hutchinson, 142 Westover Drive, Spartanburg, South Carolina. *Id.* at 47-48. Criswell then contacted the Spartanburg County Sheriff's Office and Spartanburg City Police Department to assist with a controlled delivery of the package. *Id.*

Criswell identified Government Exhibit No. 1 as the package that he received from the Louisville ICE office. *Id.* at 48-49. Criswell also identified Government Exhibit No. 2 as "the heroin that was contained within the package that [he] received from [the] Louisville office." *Id.* at 49.

Criswell then explained the role that he played in the controlled delivery, in Jackson's arrest, and in Hutchins's interview of Hutchinson and Jackson. *Id.* Criswell also explained that he presented information from the investigation to the U.S. Attorney's Office, and a federal grand jury indicted Williams, Jackson, and Hutchinson on January 8, 2008. *Id.* at 49-50. After the indictment, federal arrest warrants were issued. *Id.* at 50. On January 9, 2008, Criswell, Hutchins, Duncan, and an ATF agent went to arrest Williams at Williams's residence. *Id.*; *id.* at 2.

Criswell identified Government Exhibit No. 4 as a statement of rights and waiver of rights form ("waiver form"). *Id.* at 50-51; Govt. Ex. No. 4. Criswell explained that he read the waiver form to Williams on January 9, 2008. J.A. 51-52. Williams appeared to understand his rights, did not appear intoxicated, agreed to waive his rights, and signed the waiver form. *Id.* at 52-53; Govt. Ex. No. 4. Criswell and Hutchins also signed the waiver form as witnesses. *Id.*

Criswell did not promise Williams anything or threaten him. J.A. 53. Rather, Williams freely and voluntarily gave the agents a statement regarding his involvement in the heroin shipped from Panama to Hutchinson's residence. *Id.* at 53-54.

According to Criswell, Williams said that he contacted Jackson about bringing heroin into the United States. *Id.* at 54. Williams explained that he had been in contact with a man nicknamed "Cool" in Panama and that Cool sent the package containing the heroin. *Id.* (Criswell then identified Cool as James Alexander Smith III and explained that authorities had issued a federal arrest warrant in the Eastern District of New York against Smith III. *Id.* at 55.) Williams also told Criswell that he knew another man nicknamed "Coochie" a/k/a James Alexander Smith, Jr., that Coochie had been found guilty of conspiracy to distribute heroin, and that Williams had previously obtained heroin from Coochie. *Id.*

Williams then told Criswell that Jackson was supposed to receive a package addressed to Sabrina Hutchinson and delivered to her residence. *Id.* at 55-56. When the package arrived, Jackson was to call Williams. *Id.* In exchange, Williams agreed to pay Jackson approximately $500. *Id.* at 56. Williams also told Criswell that while the package was in transit from Panama, Cool called Williams and said that the package had been held up in Kentucky. *Id.*

As for Williams's intent, Williams told Criswell that once he received the package from Jackson, he intended to sell the heroin contained in the package. *Id.* at 56-57. Williams also explained that Cool had "fronted" him the heroin, which meant that Williams obtained the heroin on credit and would use some of the proceeds of his heroin sales to pay Cool. *Id.* at 57.

On cross examination, Criswell admitted that Williams had gathered bottles of medication at his residence upon his arrest. *Id.* at 60. Criswell also admitted that Coochie is incarcerated within the Bureau of Prisons and that Williams had told Criswell that Cool was in prison in Panama. *Id.* at 61. Criswell also admitted that he had not interviewed either Coochie or Cool. *Id.*

Next, Investigator Matt Hutchins testified. *Id.* at 62-67. Hutchins identified Government Exhibit No. 4 as the waiver form that was given to Williams. *Id.* at 63. Hutchins testified that Criswell read the waiver form to Williams and that Hutchins signed the waiver form as a witness. *Id.* Hutchins explained that Williams appeared to understand his rights, that neither Hutchins nor Criswell threatened him, that Williams signed the waiver form, and that neither Hutchins nor Criswell promised him anything. *Id.* at 64. Hutchins also testified that Williams was "very well aware of what was going on" during the interview, that his information was "detailed and coherent," and Williams said that he approached Jackson

about receiving a package that would contain heroin. *Id.* at 64-65.

On cross examination, Hutchins testified that he was present when Williams was arrested and that, before leaving his residence, Williams gathered bottles of medication to take to jail. *Id.* at 65. On redirect examination, Hutchins testified that the officers did not allow Williams to ingest any medication. *Id.* at 66. Rather, Williams gathered the bottles of medication, placed them in a bag, and gave the bag to the officers. *Id.* at 66-67. The officers, in turn, gave the bag of medication to intake at the jail and told Williams that, if he needed medication, the jail nurse would have to administer the medication. *Id.* at 65-67.

Next, Sabrina Hutchinson testified. *Id.* at 86–91. Hutchinson explained that in October 2007, she was living with her boyfriend Victor Jackson at 142 Westover Drive in Spartanburg. *Id.* at 86-87. Jackson asked Hutchinson if she would let Jackson know if a package arrived. She agreed to do so. *Id.* at 87-88. Hutchinson testified that she did not know she was part of receiving heroin and did not know what Jackson was asking her to do. *Id.* at 89.

Hutchinson testified that she only completed the seventh grade. *Id.* at 88. Hutchinson also testified that after being indicted in this case, her lawyer got her to "take some tests and get some records." *Id.* at 88–89. Later, Hutchinson said that the prosecutor dismissed the conspiracy charge against her. *Id.* at 89.

On cross examination, Hutchinson admitted that she never talked with Williams about receiving a package. *Id.* at 90. Rather, Jackson spoke to her about a package and she agreed to tell Jackson when the package arrived. *Id.* Finally, she testified that she did not know that Jackson used drugs and had never met Williams or spoken to Williams on the phone. *Id.* at 90-91. She only knew Williams was a friend of Jackson. *Id.*

The defense presented one witness: the defendant. *Id.* at 67-83. Williams admitted that he had multiple drug arrests and convictions, including for using heroin. *Id.* at 68. Williams also admitted knowing Jackson since approximately 1981 and admitted that Jackson sometimes drove him places because Williams did not have a driver's license. *Id.* at 68-69. As for his more recent relationship with Jackson, Williams testified that Jackson would sell him bootleg copies of CDs and DVDs. *Id.* at 69.

Williams then testified about his medical condition. *Id.* at 70. He explained that in October or November 2007, he had a portion of his colon removed. *Id.* In early January 2008, he was at home in bed, when officers arrived with an arrest warrant naming Williams, Jackson, and Hutchinson in the charged conspiracy. *Id.* at 70-72. Before the officers took him to jail, Williams testified that he ingested prescription medicine in front of the officers. *Id.* at 70-71. Williams also testified that the medicine makes him sleepy. *Id.* at 72.

Williams then testified about his memory of the events at the jail. *Id.* at 73. Williams admitted that the officers advised him of his rights and that he signed the waiver form. *Id.* After signing the waiver form, officers then took him from the jail to the sheriff's department for an interview. *Id.* at 73-74.

During his interview, Williams told the officers that he knew a man nicknamed "Cool" and that Cool's real name was Smith. *Id.* at 75-77. Williams then identified Cool in a photographic line-up. *Id.* Williams then explained that when he told officers about agreeing to receive a package from Cool, he was talking about a package that he received from Cool ten years earlier. *Id.* at 77. As for his conversations with Jackson about accepting a package, Williams testified that he only spoke with Jackson about bootleg CDs and DVDs. *Id.* Finally, Williams testified that he had not used heroin for about ten years, that he had been married for ten years, and that he had been going to church every Sunday. *Id.* at 78.

On cross examination, Williams testified that he had been addicted to heroin in 2000, but had been clean since 2000 or 2001. *Id.* at 79–80. As for his January 2008 interview with officers, Williams testified that he confessed to being part of the conspiracy due to threats from the officers. *Id.* at 80. Williams admitted, however, that he had seen phone records indicating 44 phone calls between Jackson's phone and his phone during the time period of October 1, 2007, to October 10, 2007. *Id.* at 81-82. Williams also admitted that he was on the phone with Jackson when the officers made the controlled delivery to Jackson. *Id.* at 82.

The lawyers then delivered their closing arguments. *United States v. Williams*, No. 7:08-cr-00025-HMH-1, [D.E. 171], at 3 (D.S.C. Sept. 3, 2008). Each argument was very succinct. The prosecutor argued that the United States had proven beyond a reasonable doubt that Williams and Jackson had conspired to possess with intent to distribute a quantity of heroin. *Id.* In support, the prosecutor cited the package from Panama containing heroin and cited Williams's confession and his admission that he was on the phone with Jackson during the controlled delivery of the package of heroin. *Id.* at 3–4. The prosecutor conceded that Williams was in poor health and a former heroin addict, but urged the jury to not use sympathy to excuse Williams's behavior. *Id.* at 4. The prosecutor noted that Williams and Jackson did not mind using Hutchinson to facilitate the conspiracy and also cited the 44 phone calls between Williams and Jackson during the time period of October 1, and October 10, 2007. *Id.* at 5. The prosecutor then stressed the need to use common sense in evaluating the evidence. *Id.* The prosecutor rejected Williams's claim that officers twisted his words during his post-arrest interview, but somehow came up with the names Coochie and Cool. *Id.* Finally, the prosecutor mentioned the package of heroin, the stipulation that the package contained 98.61 grams of heroin, Jackson's testimony about how the conspiracy came into being, and Williams's confession concerning the conspiracy to possess with the intent to distribute a quantity of heroin. *Id.*

at 5–6. The prosecutor then asked the jury to convict Williams. *Id.* at 6.

In response, defense counsel returned to the defense theme: Williams had no knowledge of the alleged conspiracy and never joined it. In support, defense counsel stated: "The defense has stipulated there's heroin in that package because it was not heroin that Mr. Williams knew about." *Id.* at 6. Defense counsel then reminded the jury that the package was addressed to Sabrina Hutchinson and that Hutchinson testified that she never talked to Williams about accepting a package for him. *Id.* Rather, Hutchinson said that Jackson asked her to accept a package and that Jackson told Hutchinson that the package belonged to Williams. *Id.* at 6–7. Defense counsel then questioned Jackson's credibility in light of his guilty plea to the charged conspiracy and his hope for a sentence reduction. *Id.* Defense counsel also noted that Jackson and Williams had known each other a long time, but the relationship involved Jackson selling bootleg CDs and DVDs to Williams. *Id.*

Defense counsel then noted that the government failed to verify who sent the package of heroin from Panama and failed to interview either Coochie or Cool. *Id.* at 7–8. As for Williams's confession, defense counsel explained that he felt pressured to tell the officers what they wanted to hear and that his alleged confession actually concerned events of many years before October 2007. *Id.* Defense counsel then asked the jury to find Williams not guilty. *Id.* at 8. The jury was then dismissed for the day.

On September 4, 2008, the jury returned and the district court instructed the jury that, to prove that Williams is guilty, "the Government [was required to] prove the following elements beyond a reasonable doubt": (1) "that an agreement existed between two or more persons to possess with the intent to distribute heroin"; (2) "that the defendant knew of the conspiracy"; and (3) "that the defendant knowingly and

voluntarily became a part of the conspiracy." J.A. 102. The district court gave a variety of other standard instructions on the burden of proof, how to consider the evidence, and the law of conspiracy. *See id.* at 94-107.

After beginning deliberations, the jury sent a note to the court and asked three questions. First, the jury asked, "What amount of drugs does it take to qualify for distribution as opposed to self-use?" *Id.* at 109. The court then repeated a portion of its original charge:

> [W]hile you should consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

*Id.* at 112. It also stated:

> Basically, what you are determining is whether the drugs were for personal use of for the purpose of distribution. The possession of a large quantity of narcotics does not necessarily mean that the defendant intended to distribute them. On the other hand, a defendant may have intended to distribute narcotics even if he did not possess large amounts of them. Having said that, the larger the quantity of drugs increases the inference that drugs were possessed with the intent to distribute as opposed to personal use.

*Id.* at 112-13.

Second, the jury asked, "What is the street value of the drugs?" The court responded: "There was no testimony or evi-

dence to that effect. And we don't add to the record once you go to the jury room." *Id.* at 113.

Finally, the jury asked, "Why were phone records not submitted as evidence and can we see them?" *Id.* The court instructed the jury that "[t]he records actually were not admitted in evidence and we cannot add to the record. I can tell you that the only record is that the question was asked about the phone records and the defendant agreed." *Id.* The court also stated: "I marked as a Court's Exhibit[.] It should have gone to you anyway[;] you are being sent the stipulation which is part of the record." *Id.* The jury then resumed deliberating. *Id.*

After lunch, the jury sent a note stating: "We need to hear the judge's charge to the jury again." *Id.* at 115. The court then sent a copy of its charge to the jury. *Id.*

Later, the jury asked: "Can we get a copy of Williams' testimony? We also would like a copy of [Jackson's] testimony." *Id.* The court instructed the jury at 3:30 p.m. that it could get the testimony transcribed, but "[i]t's going to take a while. You may go back to your jury room." *Id.* at 116. The jury continued deliberating. *Id.* Later, the jury sent another note stating: "We have 11 guilty and one not guilty. We cannot reach [consensus]." *Id.* at 117.

At approximately 5:00 p.m., the court gave an *Allen* charge. *See id.* at 118-20. The jury resumed deliberations. *Id.* at 120-21. At 5:30 p.m. the jury asked: "We need to get clarification on considering evidence based on a reasonable doubt and common sense." *Id.* at 121. The court then instructed the jury on reasonable doubt and common sense. *See id.* at 121-22.

The jury later sent another note: "Tomorrow can we review the other officers' testimony?" *Id.* at 123. The court instructed the jury that "I will get the court reporter tonight to prepare all of that testimony for you so you can have it to read tomorrow." *Id.* at 124.

On September 5, 2008, the jury resumed deliberating at 9:00 a.m. *Id.* at 126. Shortly after 1:00 p.m., the jury reached a verdict and found defendant guilty. *Id.* at 126-28.

II.

I agree with the majority that the Fourth Circuit has not decided whether and under what circumstances defense counsel may waive a defendant's Sixth Amendment right to confrontation. I also agree with the majority that the First, Second, Fifth, Seventh, Ninth, and Tenth Circuits have held in published opinions that defense counsel "may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic." *United States v. Plitman*, 194 F.3d 59, 63–64 (2d Cir. 1999) (quotation omitted).[1] The rationale for this waiver rule is that a "well developed body of case law protects defendants from constitutionally defective actions of their attorneys," *Id.* at 64; *see Strickland v. Washington*, 466 U.S. 668, 687 (1984), and that courts "must accord proper weight to the role of defense counsel in fashioning an overall trial strategy, including one involving waiver of the right to confrontation, for the defendant's best advantage." *Plitman*, 194 F.3d at 64. I also agree that the Sixth Circuit has held that the confrontation right is personal and that defendant must waive it. *See Carter v. Sowders*, 5 F.3d 975, 981 (6th Cir. 1993).[2]

---

[1] *See Janosky v. St. Amand*, 594 F.3d 39, 47–48 (1st Cir. 2010); *United States v. Cooper*, 243 F.3d 411, 418 (7th Cir. 2001); *Hawkins v. Hannigan*, 185 F.3d 1146, 1154-56 (10th Cir. 1999); *United States v. Stephens*, 609 F.2d 230, 232–33 (5th Cir. 1980); *United States v. Goldstein*, 532 F.2d 1305, 1314–15 (9th Cir. 1976); *accord United States v. Gonzales*, 342 F. App'x 446, 447-48 (11th Cir. 2009) (per curiam) (unpublished).

[2] In dicta, the Eighth Circuit has stated that "the right of confrontation is personal and fundamental and cannot be waived by counsel." *Clemmons v. Delo*, 124 F.3d 944, 956 (8th Cir. 1997).

Here, Williams objected to defense counsel's tactical decision to stipulate to the forensic chemist's testimony. J.A. 11, 40–41. Nonetheless, the district court accepted the stipulation, thereby allowing defense counsel to waive Williams's right to confront the forensic chemist. Thus, under the standard of the overwhelming majority of circuits or under the Sixth Circuit standard, the district court violated Williams's Sixth Amendment right to confront the forensic chemist at trial about her testimony. *See*, *e.g.*, *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2531–42 (2009); *Plitman*, 194 F.3d at 63–64.

### III.

Of course, a defendant is entitled to a fair trial, not a perfect trial. *See*, *e.g.*, *Van Arsdall*, 475 U.S. at 681; *United States v. Hasting*, 461 U.S. 499, 508–09 (1983). Moreover, the harmless-error doctrine applies to the Confrontation Clause error that occurred during the trial. *See*, *e.g.*, *Melendez-Diaz*, 129 S. Ct. at 2542 n.14; *Van Arsdall*, 475 U.S. at 681; *United States v. Banks*, 482 F.3d 733, 741–42 (4th Cir. 2007); *United States v. Kahn*, 461 F.3d 477, 496 (4th Cir. 2006); *United States v. Iskander*, 407 F.3d 232, 240 (4th Cir. 2005). The harmless-error doctrine preserves the "principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991) (quotation omitted). "When reviewing the erroneous admission of [evidence], the appellate court . . . simply reviews the remainder of the evidence against the defendant to determine whether the admission of the [evidence] was harmless beyond a reasonable doubt." *Id.*; *Sherman v. Smith*, 89 F.3d 1134, 1137 (4th Cir. 1996) (en banc); *see* Fed. R. Crim. P. 52(a). In conducting this review, the reviewing court must examine the "whole record." *Neder*, 527 U.S. at 16. The court then must ask: "is it clear beyond a rea-

sonable doubt that a rational jury would have found the defendant guilty absent the error?" *Id.* at 18.

In applying the harmless-error doctrine in this case, the Supreme Court's *Van Arsdall* decision is instructive. In *Van Arsdall*, the Court analyzed a Confrontation Clause error and stated:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the [erroneously admitted evidence] in the prosecution's case, whether the [erroneously admitted evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [erroneously admitted evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684.

Here, the erroneously admitted evidence was the stipulation which identified the substance in the package seized at the Louisville airport as heroin and stated that it weighed 98.61 grams. The stipulation did not connect Williams to the seized package or inculpate Williams in the charged conspiracy in any way. Unlike the majority, I do not believe that the stipulation (alone or in combination with the court's jury instructions) established the first element of the offense. Moreover, I believe an examination of each *Van Arsdall* factor demonstrates that "a rational jury would have found [Williams] guilty absent the [erroneous admission of the stipulation]." *Neder*, 527 U.S. at 18.

First, in determining whether the error was important in the prosecution's case, one must focus on the elements of the charged crime. *See Van Arsdall*, 475 U.S. at 684. In order to

prove Williams guilty of conspiracy to possess with intent to distribute a quantity of heroin in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C), and 846, the government had to prove "that (1) an agreement to possess [heroin] with intent to distribute existed between two or more persons; (2) [Williams] knew of the conspiracy; and (3) [Williams] knowingly and voluntarily became a part of this conspiracy." *Reid*, 523 F.3d at 315. The jury did not have to decide upon a specific quantity of heroin. *See id.*[3]

The stipulation could have impacted only the jury's finding as to the first element: whether "an agreement to possess [heroin] with the intent to distribute existed between two or more persons." *Id.* To prove this element, the government need not prove the actual procurement or even the existence of heroin. *See United States v. Yearwood*, 518 F.3d 220, 225–26 (4th Cir. 2008) ("[T]he gravamen of the crime [of conspiracy] is an agreement to effectuate a criminal act." (quotation omitted)). If Jackson had agreed with Williams to receive a quantity of heroin for distribution, and Williams had requested heroin from Cool, the actual contents of any shipment from Cool would be irrelevant to the existence of the conspiracy. If Cool had actually shipped baking soda instead of heroin, the agreement between Williams and Jackson would be unaffected.[4] Thus, the stipulation was not important or essential to prove the existence of an agreement to possess a quantity of

---

[3]The district court had the jury make a finding as to a specific drug weight. *See* J.A. 105-06. In light of the offense charged in the indictment and *Reid*, there was no need to submit the issue of drug weight to the jury. *See, e.g.*, *Reid*, 523 F.3d at 310, 314–17; *United States v. Cannady*, 283 F.3d 641, 647–49 (4th Cir. 2002); 21 U.S.C. § 841(b)(1)(C).

[4]Because the stipulation is not essential to establish the first element and did not increase the penalty for the crime beyond the prescribed statutory maximum, the defendant's right to a trial by jury was not violated. *See, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Reid*, 523 F.3d at 314–17; *United States v. Johnson*, 71 F.3d 139, 142 (4th Cir. 1995); *see also United States v. Fuller*, 162 F.3d 256, 259–61 (4th Cir. 1998). The majority does not reach this question. *See* Majority Op. at 8 n.2.

heroin with the intent to distribute. *See Van Arsdall*, 475 U.S. at 684; *Banks*, 482 F.3d at 742 (erroneous admission of unnecessary evidence that violated Confrontation Clause found harmless).

Second, even if the stipulation was important to the prosecutor's case, the stipulation was cumulative as to the first element of the offense. *Van Arsdall*, 475 U.S. at 684. Independent of the stipulation, the jury had before it: (1) Jackson's testimony concerning his role in the conspiracy; (2) Criswell's testimony concerning Williams's confession to participating in the conspiracy; (3) Hutchins's testimony concerning Williams's confession to participating in the conspiracy; (4) Williams's testimony that there were 44 phone calls between his phone and Jackson's phone from October 1 to October 10, 2007; and, (5) Williams's corroboration of Jackson's testimony that he was on the phone with Jackson when the package was delivered. Notably, Williams's confession included a statement of his intent to distribute and that he had procured the drugs on credit. *See United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004) (purchase of drugs by credit arrangement suggests conspiracy with intent to distribute). The promise of $500 to Jackson for the simple act of receiving a package of heroin at Hutchinson's residence and calling Williams indicates a conspiracy with the intent to distribute. *See United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976). The 44 phone calls between Jackson and Williams in a ten-day period (i.e., October 1 to October 10, 2007) indicate a conspiracy. *See Yearwood*, 518 F.3d at 226. Furthermore, Williams testified that he no longer used heroin, and there was no evidence of personal use by anyone. Thus, independent of the stipulation, there was overwhelming proof of an agreement to possess heroin with an intent to distribute. Simply put, the stipulation was cumulative as to the first element.

Third, the stipulation's statement that the seized package contained heroin was corroborated by overwhelming and uncontroverted independent evidence. *Van Arsdall*, 475 U.S.

at 684. Specifically, Murphy testified that the substance was heroin based on a field test. J.A. 23–25. Such "field test" testimony is competent to demonstrate that the substance seized was heroin. *See*, *e.g.*, *Sherman v. Scott*, 62 F.3d 136, 142 n.5 (5th Cir. 1995); *United States v. Paiva*, 892 F.2d 148, 160 (1st Cir. 1989); *see also Gonzalez*, 342 F. App'x at 447-48; *United States v. Blotcher*, 92 F.3d 1182, 1996 WL 442882, at *5-7 (4th Cir. 1996) (per curiam) (unpublished table decision). In addition, Murphy testified that, based on his training and experience, the packaging of the substance in the seized package was consistent with how smugglers packaged illegal narcotics. J.A. 24. Murphy's testimony and the package of heroin were received into evidence without objection, and Murphy then showed the package of heroin to the jury. *See id.* at 21-25; *see also id.* at 45, 92; Govt. Ex. No. 2. Duncan also testified that the package of heroin contained in Government Exhibit No. 2 was contained inside Government Exhibit No. 1, explained the controlled delivery to Jackson, and again showed the package of heroin to the jury. *Id.* at 44-45. Furthermore, Criswell explained his role in the investigation, described Williams's confession, and again showed the package of heroin to the jury. *Id.* at 47-49; Govt. Ex. No. 2. Thus, three witnesses showed the package of heroin to the jury and identified the package of heroin as being in the package sent from Panama addressed to Sabrina Hutchinson, seized in Louisville, and delivered to Jackson. Therefore, independent of the stipulation, the evidence overwhelmingly establishes that the substance in the package was heroin.

As for the stipulation's reference to the heroin weighing 98.61 grams, I agree that there was no other evidence that the heroin weighed precisely 98.61 grams. *Cf. Van Arsdall*, 475 U.S. at 684. However, the stipulation was not "the only evidence of the amount of heroin." Majority Op. at 9. While I acknowledge the difference between "weight" and "amount," we should focus on whether that precise weight figure would be material to a rational jury. *Neder*, 527 U.S. at 18-19; *Van Arsdall*, 475 U.S. at 684. In my view, the precise weight fig-

ure would not be material to a rational jury. Rather, the more probative piece of evidence to a rational jury would be the amount of the substance that three witnesses identified as heroin and showed to the jury. After all, jurors do not just hear testimony during a trial. They also see the physical evidence that is introduced, such as the package of heroin introduced as Government Exhibit No. 2 in this case. Here, the package of heroin that the jury repeatedly saw was evidence — independent of the stipulation — both of the amount of heroin and that the amount was intended for distribution. *See*, *e.g.*, *United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir. 2007); *United States v. Wright*, 131 F.3d 1111, 1112-16 (4th Cir. 1997); *United States v. Richards*, 638 F.2d 765, 769 (5th Cir. 1981); *Dolan*, 544 F.2d at 1221-22. Moreover, the court instructed the jurors that the amount of heroin was not dispositive to the determination of whether the drugs were intended for distribution. J.A. 112-13. The court also instructed the jurors that they should use their reason and common sense to evaluate the evidence and testimony they had heard. *Id.* In addition, a rational jury determining intent would focus on the credibility dispute among Jackson (who testified to his role in the conspiracy), the agents (who testified about Williams's confession), and Williams (who testified that the agents threatened him and misunderstood him during his interview, but who also made key admissions during his trial testimony). A rational jury's analysis of the credibility dispute would not be impacted by the stipulation because the stipulation did not inculpate Williams and was unrelated to the credibility dispute. *See*, *e.g.*, *Neder*, 527 U.S. at 18-19; *Van Arsdall*, 475 U.S. at 684.

Fourth, the record lacks any evidence contradicting the stipulation. *See Van Arsdall*, 475 U.S. at 684. Williams's entire theory of the case was that he did not know about the conspiracy alleged in the indictment among Jackson, Hutchinson, and others "known and unknown to the grand jury," and that he did not join the conspiracy alleged in the indictment. Therefore, Williams never contended that the package did not

contain heroin or "raised evidence sufficient to support a contrary finding." *Neder*, 527 U.S. at 19; *Van Arsdall*, 475 U.S. at 684; *Schneble v. Florida*, 405 U.S. 427, 432 (1972); *United States v. Abu Ali*, 528 F.3d 210, 256–57 (4th Cir. 2008). Further, Williams never contended that the heroin was intended for personal use, as opposed to distribution and therefore "never raised evidence sufficient to support a contrary finding." *Neder*, 527 U.S. at 19. Indeed, Williams testified that he had not used heroin since 2000 or 2001. Williams also did not contend that Jackson or Hutchinson obtained the package of heroin for personal use in that there was no evidence that either Jackson (a crack cocaine addict) or Hutchinson ever used heroin. The only two elements that Williams will contest at his new trial are the same two elements that he contested at his first trial and which had nothing to do with the stipulation: whether he knew of the conspiracy alleged in the indictment and whether he knowingly and voluntarily became a part of the conspiracy. *Cf. Neder*, 527 U.S. at 19-20 (finding error harmless where defendant did not dispute omitted element); *United States v. Lovern*, 293 F.3d 695, 700–01 (4th Cir. 2002) (same).

Fifth, Williams had ample opportunity to cross examine Murphy, Duncan, and Criswell on the facts contained in the stipulation, specifically the identity of the substance in the package and its weight. He never did so. For example, Williams's attorney chose to forgo cross examination of Murphy, without objection from Williams, despite Murphy's testimony that the substance field tested positive for heroin and was packaged consistent with drug smuggling. Moreover, the record reflects that had the stipulation been rejected, and had the forensic chemist testified, the cross examination of the chemist would have been identical to that of Murphy — nonexistent.

Finally, the overall strength of the prosecution's case dictates a finding of harmlessness. *See Van Arsdall*, 475 U.S. at 684. "[T]he government presented a substantial amount of

evidence tending to inculpate [Williams]." *Banks*, 482 F.3d at 742. The stipulation was, at most, "duplicative of a wealth of other evidence" presented by the prosecution. *Khan*, 461 F.3d at 496; *United States v. Smith*, 451 F.3d 209, 222 (4th Cir. 2006); *United States v. Mackey*, 114 F.3d 470, 474–75 (4th Cir. 1997); *United States v. Blevins*, 960 F.2d 1252, 1262–63 (4th Cir. 1992). Further, the two elements that Williams contested — whether he knew of the conspiracy alleged in the indictment and whether he knowingly and voluntarily became a part of the conspiracy — had nothing to do with the stipulation. A rational jury would not have considered the stipulation in determining whether the government proved those elements beyond a reasonable doubt.

Each *Van Arsdall* factor strongly indicates that the error was harmless beyond a reasonable doubt. Having reviewed the whole record under the governing standard, I am convinced that the district court's error concerning the stipulation was harmless beyond a reasonable doubt. *Neder*, 527 U.S. at 18-20; *see Lovern*, 293 F.3d at 700-01; *United States v. Perry*, 46 F.3d 1128, 1995 WL 45521, at *4 (4th Cir. 1995) (per curiam) (unpublished table decision) (Defendant "failed to present any evidence to cast doubt on the stipulation's validity . . . . The stipulation at issue in this case was not an admission of guilt. [Defendant] never questioned that the bank was robbed or whether its deposits were federally insured. The sole issue challenged by the defense was one of identity."). Thus, I respectfully dissent and would affirm the conviction.

## IV.

As for Williams's sentencing, the statutory maximum term of imprisonment for conspiracy to possess with intent to distribute a quantity of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846 is 240 months. *See* 21 U.S.C. § 841(b)(1)(C). At Williams's sentencing hearing, Williams did not object to the drug weight of 98.61 grams or present any evidence to show that such an amount was not properly

attributed to him. *See* J.A. 134–47, 160, 171–73; *cf.* U.S.S.G. § 2D1.1(c)(8) (2008). In light of Williams's accountability for 98.61 grams of heroin and U.S.S.G. § 2D1.1(c)(8), the presentence report ("PSR") provided for a base offense level of 24. *See* J.A. 165; U.S.S.G. § 2D1.1(c)(8) (2008). Thus, the district court calculated Williams's advisory guideline range as 63 months to 78 months. After considering the 18 U.S.C. § 3553(a) factors, the district court sentenced Williams to 78 months' imprisonment. J.A. 148–49.

Williams argues that the district court violated the Confrontation Clause in relying on the stipulated weight of the heroin at sentencing and the error was not harmless. Williams's argument, however, fails because the Confrontation Clause did not bar the sentencing court from considering the stipulated weight of the heroin. *Cf. Fry v. Pliler*, 551 U.S. 112, 121 (2007) ("[I]t would not matter which harmless error standard is employed if there were no underlying constitutional error."). As the Fourth Circuit has explained repeatedly, "because the Sixth Amendment does not apply to the process of calculating an advisory sentence under the [U.S. Sentencing] Guidelines, [any] Sixth Amendment-based evidentiary restrictions do not apply to that process either." *United States v. Dean*, 604 F.3d 169, 174 (4th Cir. 2010).[5] Thus, the district court did not violate the Confrontation Clause and properly relied on the stipulated drug weight of 98.61 grams in the

---

[5]The principle is so well established that it appears in countless unpublished decisions. *See*, *e.g.*, *United States v. Martinez*, 274 F. App'x 291, 293 (4th Cir. 2008) (per curiam) (unpublished); *United States v. Debreus*, 255 F. App'x 725, 727 (4th Cir. 2007) (per curiam) (unpublished); *United States v. Sullivan*, 238 F. App'x 955, 956 (4th Cir. 2007) (per curiam) (unpublished); *United States v. Levesque*, 232 F. App'x 364, 366 (4th Cir. 2007) (per curiam) (unpublished); *United States v. LaChance*, 223 F. App'x 237, 238 (4th Cir. 2007) (per curiam) (unpublished); *United States v. Newbold*, 215 F. App'x 289, 299 (4th Cir. 2007) (per curiam) (unpublished); *United States v. Statts*, 189 F. App'x 237, 238 (4th Cir. 2006) (per curiam) (unpublished); *United States v. Cole*, 180 F. App'x 435, 438 (4th Cir. 2006) (per curiam) (unpublished).

PSR. *See* Fed. R. Crim. P. 32(i)(3). Accordingly, there was no error at sentencing, and I also would affirm the sentence.